**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00437-CR**
**NO. 09-24-00438-CR**
_____

**FABBIAN DONTA SCOTT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause Nos. F21-36748 and F21-36749**

**MEMORANDUM OPINION**

Appellant Fabbian Donta Scott appeals his convictions in trial cause numbers

F21-36748 and F21-36749 for trafficking of persons, a first-degree felony. *See* Tex.

Penal Code Ann. § 20A.02(a)(7)(E), (a)(8), (b)(1). In trial cause number F21-36748,

a grand jury indictment alleged that on March 1, 2021:

<u>Paragraph One</u>

[Scott] . . . knowingly traffic[ked] [Amy[1]], a child younger than 18 years of age and . . . by any means cause[d] [Amy] to engage in or become a victim of conduct prohibited by Texas Penal Code Section 43.02 – Prostitution[; and]

<u>Paragraph Two</u>

[Scott] . . . knowingly receive[d] a benefit from participating in a venture that involved trafficking [Amy], a child younger than 18 years of age and . . . by any means cause[d] [Amy] to engage in or become a victim of conduct prohibited by Texas Penal Code Section 43.02 – Prostitution[.]

In trial cause number F21-36749, a grand jury indictment alleged that on March 1, 2021:

<u>Paragraph One</u>

[Scott] . . . knowingly traffic[ked] [Christy], a child younger than 18 years of age and . . . by any means cause[d] [Christy] to engage in or become a victim of conduct prohibited by Texas Penal Code Section 43.02 – Prostitution[; and]

<u>Paragraph Two</u>

[Scott] . . . knowingly receive[d] a benefit from participating in a venture that involved trafficking [Christy], a child younger than 18 years of age and . . . by any means cause[d] [Christy] to engage in or become a victim of conduct prohibited by Texas Penal Code Section 43.02 – Prostitution[.[2]]

---

[1] We refer to the victims and witnesses other than law enforcement or medical personnel by pseudonyms. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] For each cause number, the jury was instructed that it could find Scott guilty of Trafficking of Persons on either of the two grounds alleged in the indictment. Appellant does not challenge the jury instructions on appeal.

The two causes were consolidated for trial. In both trial cause numbers, Scott pleaded "not guilty." The jury found Scott guilty as charged in each indictment and in both cases assessed punishment at twenty years of imprisonment. In each case, the trial court sentenced Scott in accordance with the jury's verdict, and the trial court ordered that the sentences run consecutively. Scott timely filed notices of appeal. In one issue, Scott challenges the sufficiency of the evidence supporting the jury's verdict on each case. We affirm.

Evidence at Trial

## Unchallenged Background Facts Established at Trial

Amy was 16 years old at the time of the alleged trafficking and Christy was 17 years old at the time of the alleged trafficking.

## Diane's Testimony

Diane testified that she had attended high school with Amy and Christy and was friends with them during that time. According to Diane, in March of 2021, she would have been almost eighteen years old, and Amy and Christy would have been younger than Diane. Diane testified that Amy was very kind in high school, but she was bullied at school. According to Diane, Amy and her mother did not get along, Amy's mother was always working, and Amy ran away from home on several occasions in high school, went out with older guys from school and experimented with drugs. Amy's friend Christy was in the same grade as Amy, and Christy also

3

argued with her parents who had a problem with Christy's boyfriend who was older than high school age.

Diane testified that shortly before March 1, 2021, she had to pick up Christy and Amy from a hotel and Diane thought "it was very sketchy[]" and Diane believed that Amy was selling herself for sex. According to Diane, over the years while she was friends with Amy and Christy, Amy's and Chrisy's situation "got worse[]" and they began missing school and, when Amy came to school, she appeared to be under the influence of drugs.

On March 1, 2021, Christy called Diane from Christy's cell phone from a "tattoo house" in Groves. Christy was on the phone for a few seconds, was not making sense, and then someone else Diane did not know picked up the phone. The man asked if Diane could pick up Christy because she was falling asleep, he could not finish her tattoo, he was concerned for her well-being, and he had read messages between Diane and Christy and thought that Diane was a trusted friend of Christy's. Diane drove to the street named by the man on the phone, and she met a Hispanic man and his wife there. Diane went inside their home and found Christy sleeping, and the Hispanic man and his wife told Diane that Christy had been "up for four days." Diane put Christy in Diane's car to take her home, and Christy seemed like she was under the influence of some type of drug and was saying that she was scared, that someone was going to kill her, that she did not know where Amy was, that she

could not leave the house and leave without Amy, and that Diane needed to leave her at the tattoo house. Diane was scared, started crying, and called Amy's sister, Alyssa, whom Diane believed was the only person that cared for Amy and Christy, and Alyssa could be trusted. Diane told Alyssa that she thought Amy and Christy were in danger. According to Diane, although she felt like Amy and Christy were in a very dangerous or bad situation, she was scared to call the police because she was worried Christy and Amy would get into trouble. On an occasion just before this, Christy had asked Diane to take her to the doctor because Christy believed she had a sexually transmitted disease, and Diane had planned to give her a ride to the doctor but never did "because that's when the whole situation happened."

Diane testified that she later spoke to a detective in this case and provided a phone number for the detective to contact Amy and a phone number and email address to contact Christy because Christy's phone number was not working, and Diane would "chat" with messages similar to texts with Christy through the email address. Diane provided the phone numbers and email addresses at trial. Diane had not spoken with Christy since the reporting of the "tattoo house" incident, but she was still friends with Amy and occasionally contacted her even though Amy lived in another state at the time of trial. Diane testified that she did not know the defendant and had never even heard his name.

<u>Rachel's Testimony</u>

Rachel, Amy's stepmother, testified that Amy's biological mother and father divorced about fifteen years before trial. According to Rachel, Amy is autistic and "vulnerable[,]" and when Amy was in high school, she and her best friend at the time, Christy, started making friends "with the wrong type of kids[,]" including older people already out of high school. Rachel noticed changes in Amy's behavior and Amy was running away from home often "to seek independence[]" despite having a good support network at home. Amy's mother and father both traveled for work often and the family was growing concerned with Amy running away from home because she could be put in dangerous situations.

Rachel testified she met Christy on February 26, 2021, when Christy came over to "hang out" with Amy at Rachel's apartment in Port Arthur. Amy and Christy asked Rachel if later that night she could drop them at an apartment complex where Christy lived in Nederland and pick them up later. Rachel dropped them off but did not pick them up because they decided to spend the night there. The next morning, Amy told Rachel that instead of Rachel picking them up, that they were going to get their nails done. Amy never called Rachel after the nail appointment, and when Rachel tried to message or call Amy, the messages and calls were not going through, like someone had turned off the cellular service to the phone. Rachel explained that typically when Amy would run away it would be for a few days, and on this occasion

6

the family became more concerned because she stayed gone for roughly a couple of weeks. The next time Rachel saw Amy was when Amy was recovered by the police about a week after the police became involved in this case.

Once Amy was recovered, Rachel, Amy's father, and Amy's biological mother made sure Amy received counseling and additional support. Prior to March 1, 2021, Rachel had not known that Amy had been involved with prostitution, and she had no personal knowledge that Amy had been using drugs although she had suspicions about the drug use. Rachel confirmed at trial Amy's cell phone number. Rachel testified that she did not know Fabbian Scott and had never seen him before trial.

Testimony of the Niya Knighton

Niya Knighton, a forensic nurse at St. Elizabeth Hospital, testified that she conducted the sexual assault exams on Amy and Christy on March 3, 2021, and Amy and Christy's medical records from St. Elizabeth, including Knighton's report from the sexual assault exams, were admitted into evidence. Knighton testified that the documents reflect that seventeen-year-old Christy reported that she had met Jake Jones, and he was friendly with her and gave her drugs. Christy reported to Knighton that Jones had her perform vaginal, anal, and oral sex with people for money; would only give her a little of the money and he kept the rest but would take her to get her hair and nails done; and he would threaten her, slap her, choke her, and punch her,

7

and he had a gun. According to Knighton's report, Christy recalled that Jones would use online platforms like "Skip the Games" and "Tinder" to post ads with pictures of her and use his phone number so men could text him to meet up with Christy for sex and that "half the time [she] was really messed [up on drugs]."

Knighton's report indicated that Christy reported that around February 27, 2020, Jones took Christy to Lafayette, Louisiana, where they stayed for two days at two different hotels. Christy explained she and Jones had an argument, Jones took her phone and put a gun to her head after she tried to call the police, and Jones later brought them back to Beaumont. Before Jones took Christy and Amy for tattoos, he made them do cocaine first. Christy reported that the people at the tattoo house could tell she was under the influence of drugs, and she told them what was going on, and the people at the tattoo house made a plan to help Christy and Amy get out of the situation by only doing an outline of the tattoo so Christy would have a reason to come back. When Jones brought Christy and Amy back the next day, he dropped them off and the tattoo artist told Christy they were not going to let Jones take them and they told her they would get the police involved. Christy was scared Jones was going to find and kill her and then the police arrived. In Knighton's opinion, Christy was describing being trafficked. Knighton testified that although Jake Jones was the perpetrator Christy named, if there were other perpetrators working with Jones,

Knighton would not have necessarily asked about that because that was more "detective work" and Knighton was more focused on medical treatment.

Knighton recalled that Christy reported that her abusers used condoms, and Knighton took vaginal and anal swabs of Christy to determine if there were other DNA profiles that could be determined. According to Knighton, there were no physical findings noted on Christy's anal and genital exam, but based on how the female sexual organ works, it is common for no physical injury to be apparent after sex. Christy tested positive for bacteria in her vaginal area but tested negative for sexually transmitted diseases. Christy was not tested for drugs because she had admitted she had been given cocaine, and due to the priority of her medical condition, she was transferred to St. Elizabeth's emergency room department.

Knighton testified that her report notes that sixteen-year-old Amy shared with her that Amy's friend Christy had come over to Amy's stepmother's apartment and told her that she knew of someone named Jake Jones who would buy her whatever she wanted. Knighton's report reflects that Amy stated that she trusted Christy and said that maybe they could get Jones to go to the mall that same weekend, which would have been about on February 28, 2021. According to Amy, Jones and another woman whom Jones referred to as his girlfriend, took Amy and Christy to Lafayette, Louisiana. When they got there, Jones pulled out a bag of cocaine and a bag of pills and pressured Amy and Christy into taking them. Amy was "messed up" from the

9

drugs and did not know what was about to happen. Knighton's notes reflected that Amy told her that Jones had made Amy download apps like "Tinder, BLK, Skip" and post ads, and that Jones would "make guys text us. . . [and] would make us do whatever he wanted." Amy reported that Jones would take Amy and Christy from hotel to hotel and would get violent with them if they did not do what he said. According to Amy, Jones threw Christy off the bed, cocked a gun, and put the gun to Christy's face and told her that if she called the police he would "leave her in the river and her remains will never be found." Amy reported to Knighton that she and Christy were stuck at the hotel and Jones was providing them with drugs "24/7" and they were in a bad condition because he got them addicted to cocaine and they were awake for two days straight. According to Amy, Jones was "like a pedophile[,]" would make them have sex with him every day, would set up everything with other men, and would take most of the money Amy and Christy would get from the men they had sex with. Amy reported to Knighton that Jones and his cousin would make sure the men paying Amy and Christy for sex would not stay longer than they should, and that Amy and Christy would not leave. Amy recalled that Jones let Amy and Christy get tattoos to make him look like a good person and that when they were at the tattoo place the lady and her tattoo artist husband "knew something was up." Knighton's report stated that Amy said that Christy "told them everything[.]" The people at the tattoo place helped Amy and Christy by coming up with a plan for them

10

to come back, and once they did the tattoo artist had Amy and Christy block Jones's number and "all the contacts [they] had with him[]" and Amy believed that after Jones dropped them off he "knew he messed up[]" and "he didn't come back[.]"

Knighton testified that as part of her job she was familiar with the website "Skip the Games" and that these types of websites were platforms for sex traffickers to post ads. According to Knighton's report, Amy reported that Jake or his cousin "would always be there[,]" and that Amy identified another person besides Jake involved in her trafficking, but Knighton testified that she was focused more on Amy's medical treatment than on determining Amy's perpetrators and that was a job for the detectives. Knighton recalled that Amy never stated the name of Jake's cousin. Amy tested positive for chlamydia in her vaginal and rectal areas and had elevated levels of bacteria in her urine. She also tested positive for amphetamines, cocaine, and cannabinoids. According to Knighton, Amy reported that her abusers used condoms, but that based on Amy testing positive for chlamydia, it was likely condoms were not always used. Knighton testified that Amy reported oral, vaginal, and anal penetration, and that Amy's exam revealed a small well-healed anal tear and a small well-healed vaginal tear. Knighton explained that even though the injuries were well-healed, injuries of that nature can heal in a few days so Amy's injuries could have been recent.

11

<u>Alyssa's Testimony</u>

Alyssa, Amy's older sister, testified that in March of 2021, she was eighteen and Amy was sixteen. According to Alyssa, Amy started to "act out" in high school to fit in better and changed her taste in music, how she dressed, changed her friend group, would argue with her and their stepmother, and would sometimes come home smelling like weed.

Alyssa recalled that on May 1, 2021, after Amy had been gone for about a week, Amy's friend Diane called, crying and hysterical, and told Alyssa that she knew where Amy and Christy were because Amy had called Diane to come get her. Diane told Alyssa that Amy and Christy looked "high[,]" and she felt that they were in danger. Based on what Alyssa learned, she believed that Amy and Christy were being trafficked and prostituted by someone else, and Alyssa called the sex trafficking hotline. According to Alyssa, this was the longest time that Amy had been gone without communicating with someone, and Alyssa did not know anything about Jake Jones or Fabbian Scott. Once Amy was recovered, Amy confided in Alyssa everything she had gone through. Ultimately, because of the "fallout" from the situation, Alyssa and Amy both dropped out of school.

<u>Carrie's Testimony</u>

Carrie testified that in 2021 she and her husband lived in Groves and her husband did tattoos in their house for extra money. In the months before March 2021,

Carrie met Christy and Amy because they had inquired about getting tattoos, but Carrie did not know they knew each other. Christy and Amy each came to the house separately on a prior occasion.

The first time Carrie realized Amy and Christy knew each other was on March 1, 2021, when they both came to the house. On that night, Amy arrived at the house for a tattoo and a white truck dropped her off. According to Carrie, her instinct was that something was going on because Amy was acting "completely different[,]" looked like she was under the influence of something, looked like she had been up for days, and looked like she wanted to tell Carrie something. Later, Amy said that the person that had dropped her off was her boyfriend, but Carrie could tell she was lying. Amy did not open up to Carrie, and Carrie continued to tell her husband that something was wrong. Amy left and Christy was dropped off by the same white truck, Amy then got in the truck, but Carrie could not see the driver. Christy came in and seemed "high on a few things[]" and told Carrie and her husband that her pimp was the person who had dropped her off and that she felt like she had gotten Amy into something she could not get her out of, and they were scared. Carrie called one of Amy's and Christy's friends that had tried to contact them. Christy was scared to leave with the friend, so Carrie convinced Christy to stay at the house. Christy told Carrie that Christy had "been with the guy longer" than Amy and that Amy had only been there for "four days at that time at that hotel in Beaumont." According to

Carrie, she knew at this point that Amy and Christy may be in danger and asked Christy to share their location with Carrie on her phone. Carrie told her husband to leave Christy's tattoo unfinished so Amy and Christy would have to return the next day, and then Carrie and her husband could decide whether to contact law enforcement. Christy left in the white truck. The next day, the white truck pulled up and Amy and Christy were in the vehicle. Christy got out of the truck and Amy got out but the driver, Jake Jones, acted like he did not want Amy to get out of the truck. Carrie's husband spoke to the driver and suggested that Jones leave because it would take a few hours to finish Christy's tattoo, but Jones did not want to leave. After Jones received a phone call, he left, and Amy and Christy were in Carrie's house. Carrie recalled that once Amy and Christy started "coming off the drugs[,]" they opened up to Carrie and she fed them and let them sleep. Jones was trying to call the girls on one of their phones and Carrie turned it off. Amy and Christy did not want Carrie to call their parents, and Carrie did not know their parents or have the phone numbers for the parents. The next morning, a detective arrived[3] before Carrie and her husband had a chance to call law enforcement. Amy and Christy opened up and told Carrie what they had been through. Carrie and her husband accompanied Amy and Christy to the police station and then Carrie went to the hospital with the girls

---

[3] As noted earlier, law enforcement went to Carrie's house after receiving Alyssa's call to the trafficking hotline.

for SANE exams. Carrie and her husband gave statements to law enforcement. According to Carrie, she still keeps in touch with Amy. Carrie acknowledged that it was illegal to give tattoos to minors and that she and her husband received money as tips for tattooing minors, but that Amy had told them that she had consent from her mother. Carrie testified that she did not call law enforcement earlier because she did not know they had been reported as runaways and she needed to decide what to do. Carrie recalled that Amy and Christy told her that Fabbian Scott was "the lookout." According to Carrie, she thought she mentioned to the police during her recorded interview that Amy and Christy told Carrie that Scott was "the lookout[,]" and Carrie thought she mentioned to the police that Amy and Christy had showed her and her husband a picture of Scott. Carrie identified Scott at trial as the man in the picture that Amy and Christy showed her and the man that they identified as "the lookout."

Christy's Testimony

At the time of trial, Christy was twenty years old. Christy testified that in high school Amy was her best friend, and they made good grades at school. According to Christy, she and Amy had another friend Diane, and that at some point in high school Amy and Christy started hanging out with a bad, older crowd of people. Christy and Amy would smoke weed with them but did not experiment with other drugs.

Christy testified that when she was in high school, her parents were always working, she would often argue with her parents, she would go stay at friends'

15

houses, and she sometimes would run away and do things like smoke weed, and her parents would report her as a runaway. Christy recalled that in 2021 she first met Jake Jones through some friends in the neighborhood, and he was nice to her and would give her marijuana to smoke with her friends. Jones would ask Christy if she knew anyone who would want to buy from him, she would connect people with him who were wanting to buy marijuana, sometimes she would smoke marijuana with him, and he would give her rides places.

Christy recalled that she and Amy had Amy's stepmother take them to Christy's house and then later they went to a friend's house. Later, she and Amy went to the Fuel Depot in Nederland and she called Jake. At the time, Amy did not really know Jake. Christy testified that prior to this she had told Jake she had financial problems, and Jake had told her that he could help her make a lot of money but that conversation was about selling drugs and not prostitution. Jake and a woman named "Mimi" picked up Amy and Christy in a white truck, and Mimi told Amy and Christy they needed to "do things her way[]" and she was giving them advice about things like makeup. Then they smoked what she believed was marijuana, fell asleep, and when she woke up, she was in Lafayette, Louisiana and her body felt "tired."

Jake took Christy and Amy to a La Quinta Inn in Lafayette and told them that if they did not want to be homeless, they would have to make money. Jake left, and Mimi explained to Amy and Christy that if they did what Jake said to do and became

16

prostitutes under Jake's control, he would help them get their own cars and houses. At the hotel, Amy and Christy had their own room, and Jake and Mimi had another room next to them. Mimi stayed back at the hotel and Jake took Christy and Amy shopping for underwear and bras in preparation for the prostitution. Christy testified that Jake gave them money for food, took them to get their nails done, and gave them money to buy a large box of condoms to use when they met with clients. Jake made them take pictures for the ads that he was posting online. According to Christy, their phones had no cell service, but they could use wifi on the phones and post messages like an iMessage on her iCloud account. Jake took their phones and made sure they were disconnected from cell service and would take pictures of them with their phones. According to Christy, he made Christy and Amy create accounts on websites like "Skip the Games" and download the app so they could be directly contacted. Jake showed them how to make the posts and then let them make the posts, and sometimes he used his phone to post or take pictures. Jake would handle making the arrangements with the clients, and then the clients could contact Amy and Christy through the app. Copies of ads that Christy and Amy posted on "Skip the Games" that Christy testified that Jake helped them make were admitted into evidence. Christy testified that Jake would make the posts or proofread them or finalize them.

Christy testified about one of the ads that was posted on February 27, 2021 from Lafayette, Louisiana, another ad that was posted on February 28, 2021 from

17

Lake Charles, Louisiana, and another ad that was posted March 1, 2021 from Beaumont. Christy testified that after the ads, customers wanted to buy sex from Christy and Amy, and Jake would handle the arrangements and pricing and communicate to Christy and Amy when and where to be. Christy recalled that the clients mostly brought cash for payment and that they would often use the hotel room where they stayed for prostitution. Jake would tell them to not be with a client for more than an hour because "time is money" and sometimes they could only be with a customer for thirty minutes because it was purchased as a "quick visit." According to Christy, she and Amy were in three different cities when Jake was posting the ads. Christy testified that in Louisiana she tried to call the police at one point and Amy was in the room, but Jake caught her, screamed at her, choked her, told her that he would kill her and leave her for dead in the river, threw her down, and took her phone. Christy recalled that Jake forced them to have sex with him while he was trafficking them in Louisiana. Christy testified that Jake would give them white powder to snort multiple times every day, and the powder would make them pass out, wake back up, not remember things, but kept them up for days. When they were too tired to be able to make money, Jake would get angry with them for wasting time and money. Christy testified that on February 28, 2021, they were in Lake Charles but were planning on being in Beaumont that day and were already posting ads in Beaumont's Skip the Games. Jake made Christy and Amy give him almost all the

18

money they made because he said it was his money, and he was very controlling of them. According to Christy, on any given day, she and Amy would have sex with a combined fifteen or twenty customers.

Christy testified that once back in Beaumont, she encountered Fabbian, who was sometimes called "Fabe[.]" Christy recalled that they first stayed at the America's Best Value Inn in Beaumont, and she agreed that the hotel's records admitted at trial show that they checked in there on February 28th and they were at the Howard Johnson hotel on March 1, 2021. According to Christy, Jake and Fabbian appeared to be working together, and when Amy and Christy were not with Jake, Jake would put them in Fabbian's "care." Christy identified the defendant at trial as Fabbian. Christy recalled that Fabbian Scott was with them only in Beaumont, and Jake left Amy and Christy with Fabbian at both the America's Best Value Inn hotel and also the Howard Johnson hotel. Jake told Amy and Christy that Fabbian would be in charge of them and would make sure they did not go anywhere and that if they needed something from Walgreens, he would take them there. Christy testified that while at the Howard Johnson hotel, Fabbian took pictures of Amy and Christy and helped create some of the ads they posted while they were in Beaumont. According to Christy, Fabbian took them to get clothes for the new ads for the new posts. Christy testified about one of the ads that was admitted into evidence, and she explained that Fabbian instructed them to make the ad, and Jake had sent Fabbian to

19

take "fresh pictures" for a new website. Copies of certain ads that Christy testified that Fabbian helped create which included pictures of Amy and Christy that Fabbian took were admitted into evidence.[4] Amy and Christy then picked up "licks" in Beaumont at the Howard Johnson hotel, and Christy explained at trial that "licks" were people responding to the ads and for whom she would provide sexual experiences for money. Printed text messages between Christy and Jake were admitted into evidence, and Christy testified that in the messages from February 28th Jake told her that he was going to be gone with family for a trip for a long period and his nephew would come to the Howard Johnson hotel and look out for her. Christy testified that he attached a photograph of his "nephew" to the message to let Christy know what he looked like, and it was a photograph of Fabbian Scott. Christy identified the man in the photograph was the defendant at trial, Fabbian Scott, and that he helped her and Amy take pictures at the Howard Johnson hotel and post new ads on a different site. Christy recalled that Fabbian took photographs of her and Amy multiple times in Beaumont, helped them set up and post the ads on websites with their phones, he would communicate to Amy and Christy when a "lick" was coming, he would watch over them while they were "hitting licks" in Beaumont, and then he collected the money for the "licks" when Jake was not there. According to

---

[4] Because Scott does not challenge that Christy and Amy were engaging in prostitution through these ads, we need not describe in detail the ads or photographs. *See* Tex. R. App. P. 47.1.

Christy, Fabbian would always be close by the hotel or right outside while she and Amy were "hitting licks." Christy testified that the main thing that Fabbian did was tell them to make new ads and help them take pictures and create the new ads. Christy recalled that Fabbian "ma[de] sure that we were good and prepared [] to be with . . . licks or buyers."

According to Christy, Fabbian took them to the tattoo house once and Jake took them another time. Christy recalled that she and Amy wanted tattoos and went to the man and woman's house for tattoos but that "[i]t was a blur[]" because she was passing out during the day on drugs and would "wake up the next day with everything like different." Christy testified that Fabbian drove them once to get tattoos and at one point she woke up and her friend Diane was there and was concerned, but Christy was not sure if she was dreaming it or "tripping." According to Christy, when the police showed up at the tattoo house the next day, she was happy to get out of the situation because Jake had threatened to hurt her and shoot her if she did not do the "licks." Christy testified that prior to meeting Jake Jones she had never posted solicitation ads on websites and after he was arrested, she and Amy did not continue to engage in prostitution.

Testimony of Officer Chuck Duchamp

Officer Chuck Duchamp, a detective with the Beaumont Police Department, testified that he was working Special Crimes and investigating crimes against

21

children. According to Officer Duchamp, he investigated the trafficking of Amy and Christy in 2021. Officer Duchamp testified that the trafficking investigation was initiated by a hotline tip on March 1, 2021. With the use of a law enforcement software tool, he "ran" Amy's and Christy's phone numbers to determine if they were associated with websites known to promote sexual exploitation of children. The search resulted in active ads in the area on Skip the Games, a website known for promoting child exploitation. Duchamp attempted to get information from the phone service carriers for Amy's phone in hopes of determining the location of the phone and locating Amy and Christy to prevent further harm to them. Officer Duchamp was able to determine a general area for the location of Amy's phone, but it was not specific enough to narrow down the girls' location.

Officer Duchamp testified that he used the law enforcement search tool again on March 2, 2021, and saw that more ads associated with the girls' phone numbers had been posted on Skip the Games either late on March 1, 2021, or on March 2, 2021. According to Officer Duchamp, one of the phone numbers on one of the ads was later linked to one of the traffickers, Jake Jones. Officer Duchamp recalled attempting to get more information about Amy and Christy in hopes of finding them, and he talked with Diane, who had called Amy's sister, who made the hotline tip. On March 3, 2021, Officer Duchamp learned from Diane that she had encountered Christy at a tattoo house in Groves and that Amy and Christy were trying to escape

22

their traffickers through the tattoo house. Officer Duchamp was able to determine the location and he and another officer arrived at the location and spoke with the tattoo artist there, who directed the officers to Amy and Christy. Officer Duchamp recalled that once the girls were recovered, they were taken to St. Elizabeth's Hospital for sexual assault forensic exams. Duchamp recalled that Amy and Christy requested that the woman at the tattoo house accompany them to the hospital.

According to Officer Duchamp, as a result of the investigation, law enforcement was able to recover Amy's phone and Jake Jones's phone, and Detective Campbell, who is certified to use special software to extract data from cell phones, was able to extract data from the two phones. Officer Duchamp testified that Amy and Christy spoke about Jake Jones at both their forensic exams and in their Garth House interviews, and Amy mentioned Jake's cousin during her forensic exam. Officer Duchamp testified that Amy referred to Jake's cousin as "Jay" or "J" during her Garth House interview. Officer Duchamp recalled that there were some mentions early on in the investigation of Jake's nephew or cousin who was also involved in the enterprise. Officer Duchamp looked through Amy's cell phone data and found a contact name "Jay" in the phone and verified through the phone number that "Jay" in Amy's cell phone was actually Fabbian Scott, and both Amy and Christy provided consistent descriptions of the person they believed was Jake's

23

cousin or nephew and that Jake had directed Scott to stay with them. Officer Duchamp identified the defendant at trial as Fabbian Scott.

A report of the extracted data from Amy's phone was admitted into evidence. T-Mobile's subscriber information for the phone number that Officer Duchamp had determined was Fabbian Scott's number was also admitted into evidence. Text messages between Amy and Fabbian Scott were admitted into evidence. According to Officer Duchamp, photos sent to Fabbian on March 1, 2021 from Amy's phone were the same photos posted on the Skip the Games ads. Officer Duchamp testified that messages sent later that night from Fabbian to Amy such as "ten minutes away, he paid?" are the kind of communications that traffickers have with victims as "buys" are transpiring. Officer Duchamp testified that traffickers typically exert control over their victims, and in most of the cases he investigates, the trafficker takes the victim to a new town and then to a place like Walgreens or CVS to get toiletries and soap to get cleaned up to get ready to prostitute. Another text message from Fabbian Scott to Amy shortly after was "When her lick come take 30 for Jake[,]" which Duchamp testified he believed Fabbian was telling Amy to tell Christy to separate out money for Jake. Detective Duchamp testified that, based on his review of the data extracted from the phones, Fabbian Scott met the definition of trafficking because in Texas the trafficking definition is designed to encompass everyone involved in the trafficking enterprise. According to Officer Duchamp, he

24

had information that others were possibly involved with Jones in this enterprise of exploiting minors, but that the only person that law enforcement was able to definitively identify was Fabbian Scott. Officer Duchamp testified that it was typical for traffickers to have their victims create and post the ads on the victims' phones so that they can access the ads quickly, and that data from Amy's phone showed "bookmarks" to Amy's Skip the Games account and Jake Jones's Skip the Game's account.

Officer Duchamp testified that the data extracted from Jake Jones's phone included texts from buyers during the time Amy's and Christy's ads were posted and copies of some of those messages were admitted into evidence. The data extracted also showed that Jake Jones had the phone number Duchamp verified as Fabbian Scott's saved in Jake's contacts as "Fabe." Duchamp testified that some of the same photographs found on Amy's phone that were used to create the ads were found on Jake Jones's phone and were shared between Jake Jones's phone and Fabbian's phone. Officer Duchamp testified that one of the text messages from Jake to Fabbian extracted from Jake's phone on February 28, 2021 states, "I got two hoes working at the room. Can you watch them for me until I get back[]" and then a screenshot of the address for Best Value Inn, Fabbian texted back, "yeah, about to go now[,]" and Jake responds, "let them know you're my nephew." According to Duchamp, in another message, Jake instructs Fabbian to "get a bag of 40 coke for them, and I'll

pay you back[,]" and Duchamp testified that Fabbian receiving a financial benefit or proceeds of trafficking the girls or supplying the girls cocaine also fits the definition of trafficking. Duchamp also testified how other texts between Jake and Fabbian evidenced that Fabbian was "harboring" Amy and Christy by overseeing and trafficking them while they were committing prostitution and that by being present Fabbian was making sure they were making money.

Amy's Testimony

Amy testified that in March of 2021 she was sixteen years old. She recalled arguing with her parents in high school, running away, and her sophomore year falling in with a "bad crowd" that was older, and smoking marijuana and doing cocaine. According to Amy, Christy got them involved in the situation with Jake Jones without knowing him well and not knowing fully what it would involve. Amy recalled that when Jake picked her and Christy up, she had agreed to hang out with Christy and Jake but did not agree to stay with him. Her impression was that they would hang out and smoke weed, and she did not have any impression that they were going to try to make money. Amy testified that after Jake picked them up, Christy offered her a Xanax pill, Amy took it and smoked marijuana, and the next thing she knew they were in Louisiana. Amy realized that the trip was not going to be what she had expected when she and Christy had asked to go home, and they were not able to leave.

26

Amy recalled while in Louisiana for multiple days, Jake continued to "feed" Amy and Christy Xanax, "uppers," and cocaine, and that the drugs would make her alert but numb and unable to think properly. Amy testified that she thought it was strange that Jake and Mimi were having Amy and Christy get new clothes and soap and get their nails done, but because Jake was giving them drugs, she was not fully aware of what was going on and it did not seem like a big deal. Amy testified how Jake would make Amy and Christy create ads to post on Skip the Games and tell them what to put on the ads and how to post the ads. Amy recalled that many times she did not have her phone and Jake or someone else had it, and sometimes he would post the ads for them. Once Jake made them post the ads, it was clear to Amy what she was going to be expected to do while in Louisiana. According to Amy, sex buyers started responding to the ads in Louisiana and she was forced to prostitute herself and have vaginal, anal, and oral sex with them. Amy recalled that while in Louisiana, Christy fought back with Jake, and he dragged her around the room, choked her, and put a gun to her face and threatened to kill her. Amy testified she felt helpless and was just thinking about how to get back home.

According to Amy, once back in Beaumont, Mimi was not there but a man she thought was Jake's cousin or nephew was there. She identified the man as the defendant at trial. Amy recalled that they originally stayed in Beaumont at the America's Best Value Inn on February 28th and then the Howard Johnson on March

1st. Amy testified that when Jake left the America's Best Value Inn, he told Christy that his cousin was coming to watch them. Amy agreed that when she went to the medical exam after the police found her, she told them about Jake's cousin, but at trial she remembered that Jake said it was his nephew who was coming to watch them. She testified that she knew the defendant also as "Fabe" but at some point, she thought his name was "Jay" and had him listed in her phone contacts as "Jay." According to Amy, Fabbian would also be at the hotel or in his car, but was always close by, while Amy and Christy were "doing licks[,]" and Fabbian would collect the money. Amy testified that "if Jake wasn't there, Fabe was there[]" and vice versa. Amy recalled that when Jake was gone and Fabbian was there, Fabbian would take Amy and Christy to get things they needed from CVS or Walgreens, and they had no other way to get food without Fabbian either taking them to get food or bringing it to them. Amy testified that Fabbian also helped them move from the America's Best Value Inn hotel to the Howard Johnson hotel, and Fabbian was at the Howard Johnson with them.

A printout of messages from Amy's iCloud account was admitted into evidence, and Amy testified that the printout indicated that on March 1, 2021, she sent Fabbian pictures because either he or Jake had told her to send the pictures for them to be posted. The printout also included a message that day from Fabbian telling Amy "Ten minutes away[]" and "He paid[,]" which Amy explained were

28

messages about one of the "licks" at the hotel and were similar to messages that she would get from Jake when he was there. Similar to Jake, Fabbian would make her respond to the people inquiring to the ads, and he would tell Amy and Christy what to do or say. According to Amy, she believed that Fabbian was doing all the things in Beaumont that Jake had been doing when they had been in Louisiana. Amy recalled that every time Jake was not there, Fabbian would take the money from the "licks." Amy testified that it felt that even when Jake was gone, if she tried to get away, Fabbian would react like Jake would, and it felt like Jake still had control over her because Fabbian was there.

Amy testified that she and Christy went to the tattoo house twice together and the first time Christy's tattoo was not finished so they went back a second time. Amy recalled that the people at the tattoo house were worried for Amy and Christy after Christy told them "what was going on[,]" the second time they were there, Amy and Christy stayed overnight. According to Amy, the next day the detectives arrived, and Amy was relieved because she was finally safe. At trial, Amy denied ever having sex with men for money prior to her involvement with Jake Jones. Amy denied having autism, and she testified that she has ADHD. Amy blamed Christy somewhat for getting her involved in all of this, and she agreed that Christy had "hinted" that she had experience doing this before because she was always getting Amy new

29

things, and when Amy inquired as to where the money was coming from, Christy would not really tell her.

## Issue on Appeal

In one issue in each appeal, Scott challenges the sufficiency of the evidence supporting the jury's verdict. In both appeals, Scott argues that the State's case "rested entirely upon the speculative and contradictory statements of the alleged victim, and conjecture and opinions of investigators and others without sufficient facts to establish beyond a reasonable doubt" that Scott engaged in the conduct alleged in the indictment.

## Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v.*

*State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

Section 20A.02 of the Texas Penal Code provides, among other things, that a person commits the offense of "trafficking of persons" if he knowingly:

> (7) traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by:
>> . . .
>> (E) Section 43.02 (Prostitution); or

. . .

(8) receives a benefit from participating in a venture that involves an activity described by Subdivision (7) or engages in sexual conduct with a child or disabled individual trafficked in the manner described in Subdivision (7).

*See* Act of June 4, 2019, 86th Leg., R.S., ch. 413, § 3.11, 2019 Tex. Gen. Laws 780, 790-91 (current version at Tex. Penal Code Ann. § 20A.02(a)(7)(E), (a)(8)). That offense is a first-degree felony, punishable by imprisonment for "life or for any term of not more than 99 years or less than 5 years." Tex. Penal Code Ann. §§ 12.32 (punishment for first-degree felonies); 20A.02(b)(1) (trafficking a child is a first-degree felony). "Traffic" means "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id.* § 20A.01(4). "Child" means "a person younger than 18 years of age." *Id.* § 20A.01(1). A person commits the offense of Prostitution if the person knowingly offers or agrees to receive a fee from another to engage in sexual conduct. *See id.* § 43.02(a).

## Analysis

The jury heard Christy and Amy identify Fabbian at trial as the person that Jake Jones left them with while Christy and Amy were engaged in prostitution in Beaumont. The jury heard Christy and Amy testify as to Fabbian's control over them, how he would help them take photographs for ads and post ads, that he would communicate with them about buyers, that he would collect the money from Amy's and Christy's prostitution, and how he would get them food and drugs and take them

to get necessities. The jury saw messages extracted from Jake Jones's and Amy's phones with messages to and from Fabbian that supported Christy's and Amy's testimony. The jury heard Officer Duchamp's testimony that Fabbian's activities in this case met the definition of trafficking.

Having viewed the evidence in the light most favorable to the verdict in cause number F21-36748, we conclude that a rational factfinder could have found beyond a reasonable doubt that Scott either (1) knowingly trafficked Amy, a child younger than 18 years of age, and by any means caused Amy to engage in or become the victim of prostitution; or (2) knowingly received a benefit from participating in a venture that involved trafficking Amy, a child younger than 18 years of age, and by any means caused Amy to engage in or become a victim of prostitution. *See Jackson*, 443 U.S. at 319; *Lucio*, 351 S.W.3d at 894; *Hooper*, 214 S.W.3d at 13. Having viewed the evidence in the light most favorable to the verdict in cause number F21-36749, we also conclude that a rational factfinder could have found beyond a reasonable doubt that Scott either (1) knowingly trafficked Christy, a child younger than 18 years of age, and by any means caused Christy to engage in or become the victim of prostitution; or (2) knowingly received a benefit from participating in a venture that involved trafficking Christy, a child younger than 18 years of age, and by any means caused Christy to engage in or become a victim of prostitution. *See Jackson*, 443 U.S. at 319; *Lucio*, 351 S.W.3d at 894; *Hooper*, 214 S.W.3d at 13. In

33

each case, the jury was able to assess the credibility and demeanor of the witnesses who testified at trial, and we presume that the jury resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *See Hooper*, 214 S.W.3d at 13; *Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. In each case, "[t]his was not a determination so outrageous that no rational trier of fact could agree." *See Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012).

Therefore, we conclude that sufficient evidence supports his convictions. We overrule Appellant's issue in both appeals and affirm the trial court's judgments.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on August 21, 2025
Opinion Delivered August 27, 2025
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

34